IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 13-01039 HG-01 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GILBERT LEE MEDINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT GILBERT LEE MEDINA'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE (ECF No. 61)**

Defendant Gilbert Lee Medina moves to suppress: (1) the statements he made to federal agents on April 9, 2013; (2) the Bersa Firestorm .380 caliber handgun that he turned over to federal agents on April 10, 2013; and (3) the statements he made to federal agents during his February 24, 2014 proffer.

The Court finds that the statements made by Defendant to federal agents on April 9, 2013 and February 24, 2014 were made voluntarily and were not the product of psychological or physical coercion. The Court also finds that Defendant Medina voluntarily turned over the .380 caliber handgun to federal agents on April 10, 2013, and he was not coerced into doing so.

Defendant Medina's Motion to Suppress Statements and Evidence (ECF No. 61) is **DENIED**.

1

## PROCEDURAL HISTORY

Defendant Medina is charged in the **Superseding Indictment** filed on January 28, 2015 (ECF No. 68) as follows:

**Count I** for conspiracy to knowingly and intentionally distribute and possess with intent to distribute five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers;

**Count II** for possession of a firearm after having been convicted of a felony;

**Count III** for attempting to enter a secure area of the Honolulu International Airport by presenting a fake and fraudulent Arizona Driver's License.

On May 30, 2013, a criminal complaint was filed against Defendant. (ECF No. 1).

On November 18, 2013, Defendant was arrested. (ECF No. 2).

On November 19, 2013, an amended criminal complaint was filed. (ECF No. 5).

Also on November 19, 2013, the Federal Public Defender's Office was appointed as Defendant's counsel. (ECF No. 6).

On November 22, 2013, the Federal Public Defender's Office

filed a Motion to Withdraw as Counsel. (ECF No. 10).

On November 26, 2013, the grand jury returned a two-count Indictment against Defendant. (ECF No. 13).

On November 27, 2013, the Motion to Withdraw as Counsel filed by the Federal Public Defender's Office was granted. (ECF No. 17).

On the same date, Andrew Park was appointed as Defendant's new counsel. (ECF No. 18).

On December 2, 2013, Defendant pled not guilty. (ECF No. 21).

On May 12, 2014, Defendant pled guilty to Counts 1 and 2 of the Indictment. (ECF No. 30).

On June 19, 2014, the Court accepted Defendant's guilty plea. (ECF No. 36).

On August 19, 2014, Andrew Park filed a Motion to Withdraw Guilty Plea on behalf of Defendant and a Motion to Withdraw as Counsel. (ECF Nos. 37, 38).

On September 2, 2014, Andrew Park's Motion to Withdraw as Counsel was granted. (ECF No. 43).

On September 3, 2014, Stuart Fujioka was appointed as Defendant's new counsel. (ECF No. 45).

On September 19, 2014, the Court received an envelope from the Defendant himself, dated September 17, 2014. (ECF No. 47). The documents included an email from Defendant to attorney Gary

Dubin, but was addressed to the Honorable Judge Gillmor with various attachments. (Id.) The email asserted that Homeland Security Investigations Agents Ryan Faulkner and Todd Nerlin had threatened Defendant in order to influence him to admit the serious allegations against him. (Id.)

On September 25, 2014, the Court held a hearing on Defendant's Motion to Withdraw Guilty Plea. (ECF No. 48). At the hearing, Defendant's new counsel, Stuart Fujioka, orally moved to withdraw the Motion to Withdraw Guilty Plea filed by Defendant's former counsel, Andrew Park. (Id.) The Court did not accept the oral request to withdraw the Defendant's Motion to Withdraw Guilty Plea given the serious nature of Defendant's allegations against the agents. (Id.) The Court ordered the Defendant and the Government to file briefs on the issue. (Id.)

On October 2, 2014, the Court received further correspondence directly from Defendant, also in the form of an email sent to attorney Gary Dubin, but addressed to the Honorable Judge Gillmor. (ECF No. 51). Defendant alleged that he was coerced at his proffer debrief which took place on February 24, 2014. Defendant also reiterated his allegations of threats by the government agents. (ECF No. 51).

On December 8, 2014, the Court held a hearing on Defendant's Motion to Withdraw Guilty Plea. (ECF No. 59). The Court found that Defendant met his burden of showing a fair and just reason

to allow him to withdraw his guilty plea based on the allegations
of the agents' misconduct. (Id.) The Court issued a Minute
Order granting Defendant's Motion to Withdraw Guilty Plea. (Id.)

On December 17, 2014, the Government filed SPECIAL
INFORMATION AS TO PRIOR DRUG CONVICTION PURSUANT TO 21 U.S.C. §
851. (ECF No. 60). The Special Information states that the
Defendant is subject to increased punishment because of his prior
felony drug convictions pursuant to 21 U.S.C. §§ 841(b), 851.

On January 5, 2015, Defendant filed DEFENDANT GILBERT
MEDINA'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE. (ECF No.
61).

On January 22, 2015, the Government filed the GOVERNMENT'S
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND
EVIDENCE. (ECF No. 66).

On January 28, 2015, the Government filed a Superseding
Indictment. (ECF No. 68). The Superseding Indictment added
Count 3 charging the Defendant with attempted entry of a secure
area of the Honolulu International Airport by presenting a fake
identity by way of a fraudulent Arizona Driver's License. (Id.)

On January 29, 2015, the Defendant filed a Reply to the
Government's Opposition to his Motion to Suppress. (ECF No. 71).

On February 17, 18, and 19, 2015, the Court held hearings on
Defendant's Motion to Suppress. (ECF Nos. 85, 86, 87).

On February 25, 2015, Defendant filed a document entitled

"MEMORANDUM TO THE BENCH RE: PROFFERED TESTIMONY OF ANDREW PARK, ESQ." (ECF No. 88). The Memorandum stated that the testimony of Defendant's previous counsel, Andrew Park, was necessary to support Defendant's Motion to Suppress. (Id. at pp. 2-3). Defendant Medina indicated he was prepared to waive his attorney-client privilege as to Mr. Park but only as to specific statements Defendant claimed to have made to Mr. Park in February 2014 concerning threats by Agents Nerlin and Faulkner. (Id. at p. 5).

On March 10, 2015, the Government filed the GOVERNMENT'S OPPOSITION TO DEFENDANT'S REQUEST TO LIMIT HIS ATTORNEY/CLIENT PRIVILEGE WAIVER. (ECF No. 89). The Government argued that Defendant's privilege should be waived as to the subject-matter of all communications with Mr. Park regarding Defendant's interactions with Agent Nerlin and Agent Faulkner, and not be limited to specific communications made to Mr. Park in February 2014. (Id. at pp. 5-6).

On April 3, 2015, the Court held a Status Conference regarding the nature of Defendant's waiver of his attorney-client privilege with his former attorney. (ECF No. 97). At the status conference, Mr. Fujioka stated Defendant wished to waive his attorney-client privilege with Attorney Park. The waiver would be concerning Defendant's communications with Mr. Park about the government agents. Mr. Fujioka decided it would be necessary to

have his client testify to clarify what he told Mr. Park concerning the alleged coercion by the agents.

On April 7, 2015, the Court held a continued hearing on Defendant's Motion to Suppress. (ECF No. 99). Defendant Medina testified in support of his Motion to Suppress and waived his attorney-client privilege as to the conversations he had with Mr. Park concerning allegations of coercion by Agents Faulkner and Nerlin.

On April 10, 2015, the Court held another continued hearing on Defendant's Motion to Suppress. (ECF No. 100). Following the hearing, the Court rendered an oral ruling denying Defendant's Motion to Suppress and indicated a written order would be filed at a later date. (Id.) This written order sets forth the Court's basis for denial of Defendant's Motion to Suppress Statements and Evidence.

**BACKGROUND**

**Defendant's Contact with Agent Faulkner and Agent Nerlin in April 2013**

Undisputed Facts:

The following facts are not in dispute as to Defendant's interactions with Homeland Security Agents Ryan Faulkner ("Agent Faulkner") and Todd Nerlin ("Agent Nerlin") between April 9 and April 11, 2013:

On April 9, 2013, agents from the United States Drug Enforcement Agency ("DEA") and Homeland Security Investigations ("HSI") executed a search warrant for a boat named the "Kiwi Rascal" registered to Defendant Gilbert Lee Medina.

While the boat was being searched, Defendant Medina went with Agents Faulkner and Nerlin to be interviewed at the Homeland Security Office.

Defendant signed a Statement of Rights form and spoke for approximately an hour and a half with Agents Faulkner and Nerlin. (Ex. 6). Agent Nerlin prepared a written statement of the information provided by Defendant Medina during the interview. Defendant Medina signed the statement. (Ex. 7).

During the interview, Defendant received and made recorded phone calls to suspected drug suppliers known as "PB" and "Oscar." (Exs. 9, 10). The agents and Defendant then proceeded to the Waikiki Grand Hotel. Defendant participated in a controlled drug buy with Oscar's nephew. Defendant wore a recording device during the drug buy. (Ex. 11). Defendant received five pieces of heroin. Defendant paid for three of the pieces and had two of the pieces fronted.

On April 9, 2013, Defendant also signed a Consent to Search form for his apartment at the Waikiki Grand Hotel. (Exh. 8). Agents Nerlin and Faulkner accompanied Defendant into his apartment at the Waikiki Grand Hotel. The agents conducted a

brief search while Defendant, his daughter, and his daughter's
friend were present.  The agents did not find anything during the
search and left Defendant at his apartment.

The following day, on April 10, 2013, Defendant met with
Agents Faulkner and Nerlin at the Magic Island Beach Park.
Defendant Medina entered the agents' car and turned over a .380
caliber firearm to the agents.

On April 11, 2013, Defendant drove to the HSI office and met
with several agents.  He completed paperwork to become a
confidential informant.  (Exh. 12).

Disputed Facts:

Defendant claims that Agents Faulkner and Nerlin threatened
him.  Defendant claims that on the morning of April 9, 2013,
while his boat was being searched, Agent Faulkner approached him
and told him that "he was in a lot of trouble," that he "had a
warrant out of California," and that "he was going to get life in
prison."  Agent Faulkner denies ever making such statements to
Defendant.

Defendant claims that while he was in the car with Agents
Faulkner and Nerlin on the way to the Homeland Security Office to
be interviewed, Agent Nerlin threatened to arrest his friend,
Beverly Bates.  Agent Nerlin claims that he did not know who Ms.
Bates was on April 9, 2013, and he denies threatening to arrest

her.

Defendant claims that during the interview on April 9, 2013, Agents Faulkner and Nerlin threatened to take his daughter away from him and threatened to deport his girlfriend. The agents deny that they threatened to take away his daughter or to deport his girlfriend. The agents state that they did not know Defendant had a daughter in Hawaii at the time and did not know who his girlfriend was.

Defendant claims that on April 9, 2013, he was alone in the car with Agent Nerlin while Agent Faulkner stopped at a convenience store. Defendant alleges that Agent Nerlin told him not to worry about assisting Agent Faulkner and told Defendant to "just worry about getting him guns and drugs." Both agents claim that Defendant was never alone in the car with Agent Nerlin. Agent Nerlin states that he never made any such statement to Defendant.

Defendant asserts that he only provided the statements, signed the forms, participated with the agents, and turned over the firearm, because he was threatened and coerced by Agents Faulkner and Nerlin.

Defendant signed a statement on April 11, 2013, when completing his confidential informant paperwork, that states that he was not using drugs or alcohol. Contrary to the April 11, 2013 statement, Defendant claimed at his Motion to Suppress

hearing that he was high on heroin and alcohol on April 9, 10, and 11, 2013.

**Defendant's Withdrawal from Cooperation and his May 2013 Arrest**

It is undisputed that Defendant Medina stopped communicating with Agent Nerlin on April 14, 2013. Defendant testified that he "went into hiding."

Defendant Medina stated during his February 24, 2014 proffer session that he was shot in the hip in May 2013. (Ex. 23 at p. 5). Defendant claimed that he dug the slug out of his hip and did not seek medical attention. (<u>Id.</u>) Defendant stated that be believes that the shooting was ordered by "Oscar" because Defendant owed him money for a heroin debt. (<u>Id.</u> at p. 6).

Defendant is charged with attempting to enter the Honolulu International Airport on May 29, 2013, by using a fraudulent Arizona Driver's License. (Superseding Indictment, ECF No. 68). Defendant Medina was arrested by the Honolulu Police Department that same day. (<u>See</u> DHS/ICE Report of Investigation at pp. 3-4, ECF No. 66-6).

**Defendant's Indictment, Proffer Session, and Guilty Plea**

The record reflects that on November 26, 2013, a grand jury returned a two-count indictment against Defendant. Three months later, on February 24, 2014, a proffer session was arranged by

Defendant's former attorney, Andrew Park to negotiate a possible plea by Defendant. (Exs. 13, 23). Defendant's former attorney, Mr. Park, testified that Defendant did not want Agent Nerlin present at the proffer session. Mr. Park stated that there were two reasons Defendant Medina did not want Agent Nerlin at the proffer session. Mr. Park testified that Defendant "felt like Agent Nerlin did not handle his case properly in the beginning. He attributed his having gotten shot [in May 2013] to Mr. Nerlin and he indicated that he didn't think Mr. Nerlin cared about him by the types of interactions they had during the beginning of the investigation in this case."

The second reason provided by Mr. Park was that Defendant claimed Agent Nerlin told him to focus on helping his own investigation and not to worry about helping Agent Faulkner. Mr. Park testified that the interaction "gave Mr. Medina the impression ... that he couldn't trust Agent Nerlin."

On May 12, 2014, Defendant entered a plea of guilty to Counts 1 and 2 of the Indictment.

**Defendant Medina's Withdrawal of His Guilty Plea and Filing of His Motion to Suppress**

The first time Defendant raised the issue of threats and coercion by federal agents to the Court was on September 17, 2014. (ECF No. 47). Defendant sent the Court filings by Malia Arciero that accused Agent Faulkner of misconduct that Defendant

claimed prompted him to reevaluate his guilty plea.  The
allegations against Agent Faulkner by Malia Arciero were
withdrawn by Ms. Arciero prior to the hearing on the Motion to
Suppress in this case.[1]

On December 8, 2014, the Court granted Defendant's Motion to
Withdraw his Guilty Plea to allow him to present his claim that
Agents Faulkner and Nerlin threatened him.  Defendant filed a
Motion to Suppress on January 5, 2015, following the withdrawal
of his guilty plea.

**ANALYSIS**

Defendant argues that the statements he made to federal
agents on April 9, 2013, the Bersa Firestorm .380 caliber handgun
that he turned over to federal agents on April 10, 2013, and the
statements he made to federal agents during his February 24, 2014
proffer should be suppressed because Agents Faulkner and Nerlin
threatened him.

---

[1] Ms. Arciero withdrew the allegations against Agent
Faulkner in her federal criminal case, <u>United States v. Malia
Arciero</u>, Crim. No. 13-1036 SOM-01.  Ms. Arciero had previously
filed a civil case in state court on March 27, 2014, accusing
Agent Faulkner of misconduct.  The complaint was never served.
<u>See</u> <u>Malia Arciero v. Ryan Faulkner</u>, Civ. No. 14-1-0787-03 GWBC
Ms. Arciero did not testify in support of Defendant's Motion and
is not involved in this case.

**A.  Defendant Was Not in Custody on April 9, 2013**

Defendant argues in his Motion to Suppress that he was in custody on April 9, 2013 and was not free to leave.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966).  For Miranda to apply, a person must have been both in custody and subjected to interrogation.  United States v. Washington, 462 F.3d 1124, 1132 (9th Cir. 2006).

The Court examines the totality of the circumstances to determine whether a person was in custody for purposes of Miranda.  Thompson v. Keohane, 516 U.S. 99, 112 (1995).

"Custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. Howes v. Fields, 132 S.Ct. 1181, 1189 (2012).  A court determines whether a reasonable person in those circumstances would have felt that he was not at liberty to terminate the interrogation and leave.  Id.  This determination considers the objective circumstances, the focus is not on the subjective views harbored by either the interrogating officers or the person being questioned.  Stansbury v. California, 511 U.S. 318, 323 (1994).

The following factors are among those most relevant when

14

determining whether a reasonable person would believe he could
terminate the interrogation and leave:

> (1)  the language used to summon the individual;
>
> (2)  the extent to which the defendant is confronted with
>       evidence of guilt;
>
> (3)  the physical surroundings of the interrogation;
>
> (4)  the duration of the detention; and
>
> (5)  the degree of pressure applied to detain the
>       individual.

United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

The list of factors is not exhaustive.  The United States
Supreme Court recently explained that the location of the
questioning, its duration, statements made during the interview,
the presence or absence of physical restraints during the
questioning, and the release of the interviewee at the end of the
questioning are other relevant factors that a court might
consider in determining whether an interviewee was in custody.
Howes, 132 S.Ct. at 1189.

### 1.    Language Used to Summon the Defendant

On April 9, 2013, Homeland Security and DEA Agents arrived
at the Ala Wai Boat Harbor to conduct a search of Defendant's
boat.  Defendant Medina testified that he was handcuffed by two
officers while he was on the boat when the agents began searching

at approximately 6:45 a.m. on April 9, 2013.

Defendant stated that Agent Cedric Lee and another agent moved him off of the boat and walked him down the pier, through the gate, and to the parking lot. Defendant testified that he engaged in "friendly chitchat" with Agent Lee. Agent Lee stated that he had brief conversations with Defendant "just of the generic nature."

Agent Faulkner stated that after he removed Defendant's handcuffs, he told Defendant that he was placed in handcuffs for a temporary time just to take him off of the boat and to the parking area because that was part of the "search warrant clearing process." Agent Faulkner testified that he explained to Defendant that they were executing a search warrant on the Kiwi Rascal and wanted to talk to him. Agent Faulkner stated that he told Defendant Medina that he was not under arrest.

Agent Nerlin testified that he approached Defendant while Agent Faulkner was removing his handcuffs. Agent Nerlin stated that he also made it "very clear to Mr. Medina that he was not under arrest." Agent Nerlin testified that he asked Defendant if would come back to the Homeland Security Office to answer questions. Agent Nerlin testified that Defendant was cooperative and said that he wanted to come back and talk to the agents.

Agent Faulkner stated that he and Agent Nerlin told Defendant that the conversation would be voluntary and that he

was not being forced or threatened in any way to have a conversation with them.

Defendant's testimony about what the agents said to him was inconsistent. Defendant claimed during his direct examination that Agent Faulkner told him that "he was in a lot of trouble," that he "had a warrant out of California," and that "he was going to get life in prison." Agent Faulkner denied making such statements.

The Government asked Defendant on cross-examination about his first interactions with Agent Faulkner on the morning of April 9, 2013. Defendant acknowledged that Agent Faulkner removed his handcuffs, and Defendant acknowledged he was not told he was under arrest.

Defendant stated that after Agent Faulkner removed his handcuffs in the parking lot, Agent Nerlin approached them. Defendant testified: "They said I was not under arrest and that they just wanted to talk to me." The Government asked Defendant: "Did anyone during that time tell you [that] you were under arrest?" Defendant Medina responded, "No, not at all."

The Court finds Defendant was informed that his cooperation was voluntary and he made the choice to accompany the agents to the Homeland Security Investigations Office to answer questions. United States v. Norris, 428 F.3d 907, 912 (9th Cir. 2005) (finding the defendant was not in custody when he was told that

his cooperation was voluntary and that he was free to terminate the interview).

## 2. Confrontation with Evidence of Guilt

There was no testimony that Defendant was confronted with evidence of his guilt by the agents. Agent Faulkner testified that he explained to Defendant that they were executing a search warrant and that the agents wanted to talk to him. Agents Faulkner and Nerlin stated that they informed Defendant that he was not under arrest and any conversations he had with the agents would be voluntary.

Defendant Medina testified that he accompanied the agents to the Homeland Security Office for the interview. Defendant acknowledges that the agents told him that they just wanted to talk to him.

Defendant does not claim that he was confronted with evidence of his guilt either while the search warrant was executed or during the interview at the Homeland Security Office. There was no evidence presented that would suggest that Defendant was in custody based on any confrontation with evidence of guilt.

## 3. The Physical Surroundings of the Interrogation

No one testified specifically regarding the space where Defendant Medina was interviewed at the HSI office. There was no

evidence presented to suggest that the room was cramped or uncomfortable. Agent Faulkner testified that when they arrived at the HSI office, Defendant was asked whether he needed something to drink or to use the restroom and Defendant Medina responded that he was "fine."

There is no evidence of the room providing any degree of restraint on Defendant's freedom. United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004). Defendant was free to receive and make telephone calls during the interview. There was no evidence that the room was locked or that the door could not have been unlocked from the inside. United States v. Redlightning, 624 F.3d 1090, 1103-04 (9th Cir. 2010).

There is no testimony about the physical surroundings of the interview room to support a finding that Defendant was in custody on April 9, 2013.

### 4.    Duration of the Interrogation

Defendant was transported from the Ala Wai Boat Harbor to the HSI office at about 6:55 a.m. on April 9, 2013, and the ride lasted about twenty minutes. Agent Nerlin testified that the interview began at 7:16 a.m. on April 9, 2013, and it lasted about an hour and a half.

The duration of the interview does not suggest that Defendant was in custody. See United States v. Manning, Cr. No.

05-00491 JMS, 2007 WL 2694344, *6 n.10 (D. Haw. Sept. 4, 2007), *aff'd in* 312 Fed. Appx. 34, 35 (9th Cir. 2009) (finding that a four hour interview was non-custodial).

### 5.    Degree of Pressure Applied to Detain an Individual

The search of Defendant's boat began at approximately 6:45 a.m. and Defendant was found on the boat.  Defendant was temporarily handcuffed and was escorted off the boat and to the parking lot by Agent Lee.  Agent Faulkner removed the handcuffs and told Defendant that the agents were there because they had a search warrant for his boat and that they wanted to talk to him. Agent Faulkner told Defendant he was not under arrest.  Agent Nerlin also told Defendant he was not under arrest and asked him if he would accompany the agents to the Homeland Security Office to answer questions.  Agent Nerlin testified that Defendant was cooperative and said that he wanted to come back and talk to the agents.

Defendant was not in handcuffs when he was asked to accompany the agents to the HSI office.  Defendant was not handcuffed while he rode to the HSI office or during the interview.  There was no testimony that guns were brandished by the agents.  Defendant was not restrained during the interview on April 9, 2013.

The Court finds that Defendant was not in custody on April

20

9, 2013.  <u>Kim</u>, 292 F.3d at 974.  Under the circumstances, a
reasonable person would have believed that he could terminate the
interview and leave.

**B.**   **Defendant's Statement and Participation Was Voluntary**

Defendant claims that even if he was not in custody, he did
not knowingly, intelligently, and voluntarily waive his <u>Miranda</u>
rights.  Defendant claims that his April 9, 2013 statements, the
firearm he turned in on April 10, 2013 and his participation at
the February 24, 2014 proffer were not voluntary.

The government has the burden of proving that a confession
was voluntary by a preponderance of the evidence.  <u>See</u> <u>Lego v.</u>
<u>Twomey</u>, 404 U.S. 477, 484 (1972); <u>United States v. Bautista</u>, 362
F.3d 584, 589 (9th Cir. 2004).  In implementing the right against
compulsory self-incrimination, the court looks to the totality of
the circumstances.  <u>See</u> <u>Schneckloth v. Bustamante</u>, 412 U.S. 218,
225 (1973).

The Court's focus is on whether the defendant's will was
overborne by the circumstances surrounding the giving of the
confession, an inquiry that takes into consideration the totality
of all the surrounding circumstances including both the
characteristics of the accused and the details of the
interrogation.  <u>United States v. Preston</u>, 751 F.3d 1008, 1016
(9th Cir. 2014) (citing <u>Dickerson v. United States</u>, 530 U.S. 428,

434 (2000)).

There is no single controlling factor.  <u>Preston</u>, 751 F.3d
1016.  "Each of these factors, in company with all of the
surrounding circumstances—-the duration and conditions of
detention (if the confessor has been detained), the manifest
attitude of the police toward him, his physical and mental state,
the diverse pressures which sap or sustain his powers of
resistance and self-control—-is relevant."  <u>Culombe v.
Connecticut</u>, 367 U.S. 568, 602 (1961); <u>see also</u> <u>Withrow v.
Williams</u>, 507 U.S. 680, 693-94 (1993).  Ultimately, the
voluntariness determination depends upon a weighing of the
circumstances of pressure against the power of resistance of the
person confessing.  <u>Preston</u>, 751 F.3d at 1016.

The Ninth Circuit Court in <u>Doody v. Ryan</u>, 649 F.3d 986, 1011
(9th Cir. 2011) explained that it is not enough for courts to
list the circumstances of an interrogation separately on a piece-
meal basis.  Courts must "weigh, rather than simply list," the
relevant circumstances, and weigh them not in the abstract but
"against the power of resistance of the person confessing."  <u>Id.</u>
at 1015-16 (internal quotation marks omitted).

The voluntariness inquiry focuses not on the truth or
falsity of the confession, but on the coercive nature of the
interrogation, taking into account the particular circumstances
of the suspect.  <u>Preston</u>, 751 F.3d 1008 at 1018.  The question

22

whether a confession was voluntary is "to be answered with complete disregard of whether or not [the confessor] in fact spoke the truth." Id. (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). A "coerced confession is inadmissible under the Due Process Clause even though statements in it may be independently established as true." Preston, 751 F.3d at 1018 (quoting Watts v. Indiana, 338 U.S. 49, 50 n. 2 (1949)).

### 1. Defendant Voluntarily Provided Statements and Evidence on April 9, 2013

On April 9, 2013, before interviewing Defendant, Agent Nerlin testified that he went over the Statement of Rights form with Defendant. (Ex. 6).

Agent Nerlin stated he went over each sentence in the Statement of Rights with Defendant. Defendant acknowledges that he signed the form. At the bottom, "waiver" section of the form, Agent Nerlin inputted the date (4/9/13) and time (7:16 a.m.) that Defendant signed the Statement of Rights.

Defendant contends that the agents did not read the Statement of Rights form to him before he signed it on April 9, 2013. Defendant Medina also testified, however, that he was aware that he had the right to remain silent and knew that he could have been represented by counsel.

On cross-examination, the Government asked Defendant about his arrest history and his previous interactions with law

enforcement.  Defendant testified that he had his rights read to
him many times and understood his rights.  The Government asked
Defendant the following questions about what he understood on the
morning of April 9, 2013:

| | |
|---|---|
| Government: | So how many times you think you've had your rights read to you? |
| Defendant: | Oh quite a few times. |
| Government: | Okay. So you understood that you have a right to remain silent? |
| Defendant: | Yes, I do. |
| Government: | And you understand that you have a right to have an attorney present? |
| Defendant: | Correct. |
| Government: | And so earlier when you talked about not having read everything on Exhibit 6 we're going to put that up on the overhead. Statement of Rights.  You claim that you didn't read all of the information that's in the top?  You claim you didn't read all that? |
| Defendant: | I just signed it. |
| Government: | But you already knew the rights that you had? |
| Defendant: | Yes, I knew the rights that I had. |
| Government: | And you knew by signing that waiver you were giving up those rights? |
| Defendant: | Yes, I did. |

Defendant Medina admitted that he understood his rights on
April 9, 2013.  Defendant acknowledged that on April 9, 2013, he
signed the Statement of Rights Form, the Consent to Search form,
and the Written Statement.

### a.   Defendant Claims that His Statements Were Not Voluntary Because of Threats is Not Credible

#### (1)   Defendant Testified that Agent Nerlin Made a Threat to Arrest Beverly Bates While Transporting Defendant to the HSI Office

Defendant Medina claims that while in the car on the way to

the HSI office on April 9, 2013, Agent Nerlin asked him questions about a woman named Malia Waters. Defendant testified that when he did not answer Agent Nerlin's questions, Agent Nerlin became angry and threatened to arrest Defendant's friend Beverly Bates. Agent Faulkner, who was also present, testified that Agent Nerlin never became angry with Defendant on the ride to the interview on April 9, 2013.

The evidence presented contradicts Defendant's claim. Agent Nerlin and Agent Faulkner each testified that they only were told who Beverly Bates was on April 16, 2013. Agent Nerlin stated that on April 9, 2013, he only knew that there was an elderly woman with whom Defendant had contact. Their first contact with her was when Ms. Bates called Agent Nerlin on April 17, 2013.

Beverly Bates testified that she had not had any contact with either Agent Nerlin or Agent Faulkner prior to April 17, 2013. Ms. Bates initiated a call to Agent Nerlin on April 17, 2013. She testified that the agents then came to her home and she met with them.

Agent Nerlin testified that Ms. Bates attempted to assist the Government in locating Defendant Medina after he had broken off contact with the agents. Agent Nerlin prepared a report documenting Ms. Bates' cooperation with the Government. (Ex. 24).

On September 29, 2014, before Defendant filed his Motion to

Suppress, Defendant Medina made a call to Ms. Bates while he was detained at the Federal Detention Center. The call was recorded. (Ex. 21, Rec. No. 54). During the conversation, Defendant Medina told Ms. Bates that the government agents never told him that they were going to arrest her. Defendant said to Ms. Bates, "they didn't tell me they were going to go arrest you." (Id.)

Defendant's former attorney, Andrew Park, testified that Defendant Medina did tell him in December 2013 that agents had threatened to involve Ms. Bates in the investigation. Mr. Park testified he saw no basis to file a Motion to Suppress on Defendant's behalf based on what Defendant said about the agents and Ms. Bates.

The Court finds that Agent Nerlin did not threaten to arrest Beverly Bates.

### (2) Defendant's Daughter

Agent Nerlin testified that on April 9, 2013, he knew that Defendant Medina possibly had two children but he had no knowledge of where those children lived. Agent Nerlin explained that the agents believed that Defendant resided on the Kiwi Rascal boat and they had not observed any children on the boat during their surveillance.

During the interview on April 9, 2013, Defendant informed the agents that he had an apartment at the Waikiki Grand Hotel.

After the interview, the Defendant led the agents to the Waikiki Grand Hotel and Defendant conducted a controlled drug buy at the Waikiki Grand Hotel.

Defendant consented to the search of his Waikiki Grand Hotel apartment on the same day as the April 9, 2013 interview. Upon Defendant and the agents entering the apartment, Defendant introduced Agent Nerlin to his daughter, who was at the apartment. Agent Nerlin testified that the agents agreed to conduct the search in a low key manner so as not to alarm his daughter. Agent Nerlin testified that they did not mention Defendant's daughter during the interview on April 9, 2013. Defendant acknowledged that he introduced Agent Nerlin to his daughter and that the agents conducted a cursory search at his request so as to not alarm her.

On April 11, 2013, Defendant provided his daughter's name and telephone number to the agents on his confidential informant paperwork. (See Ex. 12). Defendant does not dispute that he provided his daughter's name and telephone number, as a contact, to agents. It is implausible that Defendant would help the agents locate his daughter and provide them with her contact information if the agents had actually threatened to take her away from him.

There is no corroboration for Defendant's claim that the agents threatened to take away his daughter. Defendant testified

that in December 2013 he informed his former attorney, Andrew
Park, about the alleged threats made by the agents to take away
his daughter.  Mr. Park contradicted Defendant Medina's
testimony.  Mr. Park testified that he did not recall Defendant
ever informing him that the agents had threatened to take his
daughter away from him.

The Court finds that the agents never threatened to take
Defendant's daughter away from him.

### (3)  Defendant's Girlfriend

Defendant testified that agents made a threat to deport his
girlfriend at the interview on April 9, 2013.

Agent Faulkner testified that he did not know who was
Defendant's girlfriend was on April 9, 2013.  Agent Faulkner
testified that he believed that the woman who was found on the
Kiwi Rascal on April 9, 2013, later identified as Stacy Shaw, may
have been Defendant's girlfriend.  The agents had seen her and
Defendant together on the boat, in a video taken earlier by an
informant.  Agent Faulkner stated that he had no knowledge of her
immigration status.

Agent Nerlin testified that he believed that Stacy Shaw was
Defendant's girlfriend.  Agent Nerlin testified that Ms. Shaw is
a United States citizen and could not be subject to deportation.

Defendant testified that he had several girlfriends at the

time of the search.  Defendant stated that one of his girlfriends
was a woman named Katherine Kukos who was from Australia.
Defendant testified that Ms. Kukos was deported in January 2014.

Defendant testified that the night before the search was
executed on the Kiwi Rascal, he had spent the night on his
girlfriend's yacht, which was parked next to his boat in the Ala
Wai Harbor.  Defendant testified that on the morning of April 9,
2013, he boarded the Kiwi Rascal about five minutes before the
DEA and HSI Agents began the search at 6:45 a.m.  Defendant
testified that he had to walk off of his girlfriend's boat, down
the pier, and through a gate to enter his boat.  Defendant stated
that when he boarded the Kiwi Rascal he saw no sign of police
activity.

Defendant's testimony is not credible.  Officer Burt Akana
testified that the DEA and HSI agents arrived at the Ala Wai Boat
Harbor at approximately 6:00 a.m.  None of the five agents that
testified about their participation in the search of Defendant's
boat stated that they saw Defendant enter his boat a few minutes
before the search was executed.  Defendant admitted that the
Government used bolt cutters to break the lock that was on the
gate blocking entrance to his boat.  It is implausible that
Defendant was able to enter his boat and bypass the gate without
seeing police activity and without any of the officers seeing
Defendant.

Defendant Medina provided no corroboration for his claim that the agents threatened to deport his girlfriend. There is no support for Defendant's claim that Katherine Kukos was deported in January 2014. No witness other than Defendant testified that Katherine Kukos was ever his girlfriend. Defendant did not testify or provide any evidence that Agent Nerlin or Agent Faulkner knew of her or were involved in Ms. Kukos' deportation.

Defendant's former attorney, Andrew Park, did not corroborate Defendant's testimony about the alleged threats made to deport his girlfriend. Mr. Park testified that he believed that Defendant may have told him that he had a girlfriend who was deported but he was not told the agents had threatened to deport his girlfriend.

The Court finds that the agents never threatened to deport Defendant's girlfriend.

Defendant Medina's claims that the agents made a series of threats to him during the interview on April 9, 2013 are not credible. After a thorough review of the testimony and exhibits, the Court finds there is no credible evidence that Defendant was threatened or coerced by the two federal agents, Agents Faulkner and Nerlin on April 9, 2013.

> **b.    Defendant's Claim that His Statements Were Not Voluntary Because of His Heroin Use is Not Credible**

Defendant testified that his statements were not voluntarily on April 9, 2013, because he was high on heroin.

Defendant testified that he entered his boat about five minutes before the agents conducted the search on April 9, 2013. Defendant stated that he was about to take heroin when he noticed the agents on his security cameras. Defendant testified that the heroin was partially wrapped in cellophane and he placed the heroin in his rectum before the agents boarded the boat and began the search. Defendant stated that the heroin remained in his rectum for the duration of the day. Defendant also testified that he was under the influence of alcohol.

Defendant testified that he yawned throughout the day and that he vomited following the controlled drug buy at approximately 1:30 p.m. because of the large quantity of heroin in his system.

Defendant testified that heroin made him feel "normal" and that he regularly took heroin.

Agent Faulkner testified that he asked Defendant at the beginning of the April 9, 2013 interview whether Defendant Medina needed to use the bathroom and Defendant said he was "fine."

DEA Officer Burt Akana, Agent Nerlin, and Agent Faulkner all testified that Defendant did not appear to be under the influence of drugs on April 9, 2013. Agent Faulkner testified that Defendant seemed surprised when they began the search of his boat

on April 9, 2013, but Defendant appeared coherent and understood what was happening.

Officer Akana testified that during the interview on April 9, 2013, Defendant seemed normal, talkative, and able to answer questions.

Agent Faulkner does not recall asking Defendant if he was under the influence of drugs or alcohol, but stated this is a question agents typically ask. Agent Nerlin testified that he did not specifically ask Defendant if he was under the influence of drugs or alcohol but that Defendant did not appear impaired.

Defendant made a series of recorded phone calls on April 9, 2013. (Exs. 9, 10). Defendant's counsel pointed out Defendant's yawns on the tapes of the calls. Review of the tapes of the calls, however, found Defendant was coherent and involved during the calls and did not slur his words or otherwise sound impaired. Defendant was able to identify the other participants in the phone calls, to follow the agents' instructions, and to set up meetings during the calls. Defendant then went on to participate in a controlled drug buy that he had set up at the Waikiki Grand Hotel. Agent Faulkner and Officer Akana both testified that Defendant did not hesitate to participate in the calls to a source called PB and another named Oscar or to participate in the controlled buy.

The April 9, 2013 statement that was prepared by Agent

Nerlin and signed by Defendant supports the fact that Defendant was coherent and rational when he gave the statement. (Ex. 7). Defendant provided detailed information including phone numbers and identities of drug cartel members.

Defendant claims that he was high on drugs and alcohol on April 9, 2013, but at the on April 11, 2013 meeting, Defendant responded to questioning by agents that he had not been using drugs or alcohol.

On April 11, 2013, Homeland Security Investigations Agent Cedric Lee assisted Defendant in filling out the confidential informant paperwork. The Suitability Evaluation Report is part of the CI paperwork and contains a list of questions to be answered about the confidential informant. Agent Lee asked Defendant the questions and Agent Lee contemporaneously recorded Defendant's responses on the form.

Part of the Suitability Evaluation Report asks whether the confidential informant is known to be a substance abuser or alcoholic or whether the CI has a history of substance abuse or alcoholism. The response for Defendant was that he "has used drugs and abused alcohol in the past, none now. Willing to submit to drug testing."

Defendant testified that he drove himself to the meeting to fill out the paperwork on April 11, 2013, despite his testimony that he was high on heroin at the time. Agent Lee testified that

Defendant did not appear to be under the influence of drugs and that he did not drug test Defendant.

The Court finds that Defendant was not credible when he testified that he was under the influence of drugs and alcohol on April 9, 2013.

Even if Defendant was under the influence on April 9, 2013, Defendant acted intelligently, knowingly, and voluntarily. Defendant was able to make phone calls and communicate clearly and to participate in a controlled drug buy without incident. Defendant's actions on April 9, 2013 demonstrate that the statements and evidence he provided were the product of a rational intellect and free will. Shackleford v. Hubbard, 234 F.3d 1072, 1080 (9th Cir. 2000) (finding that the fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was the product of a rational intellect and a free will).

Defendant's waiver of his Miranda rights on April 9, 2013, was intelligent, knowing, and voluntary. Defendant was read his Miranda rights, he understood his rights, and he voluntarily spoke with the agents and provided a signed, written statement.

## 2. Defendant Voluntarily Provided the .380 Firearm on April 10, 2013

Defendant Medina testified that he provided the agents with the .380 caliber firearm on April 10, 2013 because of coercion.

Defendant's testimony about the events of April 10, 2013 is
inconsistent.

Defendant claims he was instructed to call Agent Nerlin on
April 10, 2013, the day after he had been interviewed and had
completed the controlled drug buy.  Defendant claims that April
10, 2013 was the day that had been arranged for him to pay back
Oscar for the fronted heroin.  Defendant testified that he called
Agent Nerlin on April 10, 2013, and asked if he could have the
money to pay Oscar back.  Defendant stated that Agent Nerlin told
him he could not give him the money because it was a Sunday and
the banks were not open.  April 10, 2013 was not a Sunday.

Defendant's claim that he had been instructed to call agents
on April 10, 2013 to get the money to pay back Oscar is not
credible.  April 10, 2013, was a Wednesday, not a Sunday as
alleged by Defendant.  Agent Nerlin would not have told him he
could not get the money to pay back Oscar because the banks were
closed.  Agent Nerlin testified that April 15, not April 10, was
the date that had been arranged to pay Oscar for the fronted
heroin.

In Defendant's April 9, 2013 Written Statement, Defendant
stated that he had previously had a .380 caliber firearm, but he
sold it to a male individual by the Modern Hotel.  Defendant
stated that he did not know the man's name, but believed that he
could get the gun back.  During the interview, Agent Faulkner

35

told Defendant that he was interested in getting the gun.

The following day, April 10, 2013, Defendant called Agent Nerlin and told him he had something to give him. Agent Faulkner accompanied Agent Nerlin to meet Defendant. Defendant got into the car that the agents were driving and revealed a .380 caliber firearm in his waistband.

Agents Faulkner and Nerlin testified credibly that they were surprised that Defendant had the firearm. Defendant told the agents that he was able to get it back from the man to whom he had sold it. There is no credible evidence that Defendant was threatened or coerced into providing the firearm.

The Court finds that Defendant voluntarily provided the .380 firearm on April 10, 2013.

### 3.    Defendant Voluntarily Participated in the Proffer Session on February 24, 2014

Defendant testified that he was coerced to participate in the February 24, 2014 proffer session because he was threatened by Agent Faulkner and by Agent Nerlin on April 9, 2013. Defendant argues in his Motion to Suppress that the threats carried over to the proffer he made on February 24, 2014.

Defendant's previous attorney, Andrew Park, requested the February 24, 2014 proffer on Defendant's behalf. (Ex. 13). Mr. Park testified that he requested the proffer be conducted with Agent Faulkner but not with Agent Nerlin. Mr. Park testified

that he believed that he told AUSA Roberts that Medina did not trust Agent Nerlin.

Mr. Park stated that AUSA Roberts informed him that Agent Nerlin was away and the proffer session would therefore take place while Agent Nerlin was not in town.

Mr. Park never indicated to the AUSA or to the government agents that Defendant sought the proffer because he had been threatened by Agent Nerlin and Agent Faulkner. According to Mr. Park, Defendant believed that Agent Faulkner was more trustworthy than Agent Nerlin. Mr. Park stated that Defendant told him that at one point on April 9, 2013, Defendant was alone in the car with Agent Nerlin and Agent Nerlin told him not to worry about Agent Faulkner's investigation but that he should "just worry about getting him guns and drugs." Mr. Park does not recall informing AUSA Roberts of this information.

Agent Faulkner and Agent Nerlin both testified that Defendant was never left alone in the car with Agent Nerlin. Agent Nerlin testified that he never made such a statement to Defendant. The Court finds that even if the statement had been made, the statement itself is not a threat.

Agent Faulkner testified that there was no indication that Defendant was not willing to participate in the proffer session. Neither Defendant nor his attorney, Mr. Park, stated there had been any threats made to Defendant Medina by agents or the

37

government before, at the proffer session, or after the proffer session.

Mr. Park claims that Defendant told him that he attributed his getting shot to Agent Nerlin, but he did not provide any basis for the Defendant's belief. Defendant was transported from state custody to federal custody for the proffer session on February 24, 2014 by Agent Faulkner. Defendant told Agent Faulkner during the transport that in May 2013, after he ceased contact with the agents, he had been roughed up by some guys and shot. Agent Faulkner stated that Defendant "didn't really go into much detail at that time about the circumstances surrounding that." Defendant never told Agent Faulkner that he believed the shooting had anything to do with Agent Nerlin or his cooperation with the agents.

The Report of Investigation regarding the February 24, 2014 proffer session states that Defendant provided information about drug activities he was involved with between 2011 and 2013. (Ex. 23). Defendant also provided information about individuals who were transporting large amounts of methamphetamine, marijuana, and money from California to Hawaii, including a woman named Nina who Defendant believed the agents would be able to locate.

The Report of Investigation states that Defendant believes that "his shooting was ordered by a Mexican drug supplier named 'Oscar' because [Defendant] owed him money for a heroin debt."

(Ex. 23 at p. 6). Defendant did not state during the proffer that he attributed his getting shot to Agent Nerlin or was a result of his cooperation with the agents.

The Court finds that the Defendant voluntarily participated in the proffer session on February 24, 2014.

After weighing the factors and examining the totality of the circumstances, the Court finds that Defendant's statements and evidence provided on April 9, 2013, the .380 caliber firearm provided on April 10, 2013, and the statements made during the February 24, 2014 proffer are admissible because they were made voluntarily.

## **CONCLUSION**

Defendant was not in custody on April 9, 2013.

Defendant was not threatened or coerced by Homeland Security Investigations Agents Ryan Faulkner or Todd Nerlin.

Defendant voluntarily provided statements and evidence on April 9, 2013.

Defendant voluntarily provided the .380 caliber firearm on April 10, 2013.

Defendant voluntarily participated in the February 24, 2014 proffer session.

Defendant Gilbert Lee Medina's Motion to Suppress Statements and Evidence (ECF No. 61) is **DENIED**.

IT IS SO ORDERED.

DATED:     Honolulu, Hawaii, May 28, 2015.



 /s/ Helen Gillmor

Helen Gillmor
United States District Judge